UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SHAADOUL CLERVEAUX,

              Petitioner,

    v.                                          18-CV-1131
                                                DECISION AND ORDER

JEFFREY J. SEARLS, and

THOMAS E. FEELEY,

              Respondents.

_____

       The United States Department of Homeland Security ("DHS") has detained the

petitioner, Shaadoul Clerveaux, since February 27, 2018—more than seventeen

months.  In that time, the government has never given Clerveaux an individualized

hearing to determine whether he is a flight risk or poses a danger to anyone or the

community.  Clerveaux now petitions this Court for a writ of habeas corpus under 28

U.S.C. § 2241 and seeks release.  Docket Item 1.  He argues that his "prolonged

detention without an individual bond hearing" violates the Due Process Clause.  *Id.* at 9.

       Because Clerveaux is an "arriving alien," this Court disagrees that the Due

Process Clause requires the relief that Clerveaux demands.  But both because

Clerveaux has been subject to prolonged detention and because he has not received

the "rigorous review" necessary under 8 U.S.C. § 1182(d)(5)(A) to sustain such

detention, *see Chi Thon Ngo v. I.N.S.*, 192 F.3d 390, 392 (3d Cir. 1999), this Court

conditionally grants his petition.

## FACTUAL BACKGROUND

The following facts, taken from the record, come largely from filings with DHS.

## IMMIGRTION HISTORY, TIES TO THE UNITED STATES, AND CRIMINAL PROCEEDINGS

Clerveaux is a twenty-three or twenty-four year old man[1] who is a native and citizen of Haiti. Docket Item 3-1 at 2, 3-2 at 9. In October 2012, when he was only sixteen or seventeen years old, Clerveaux legally applied for admission into the United States and requested asylum. Docket Item 3-1 at 2. He arrived and applied with his father and his sister. *Id.* Clerveaux's father explained to DHS officials that "he decided to travel to the United States with his children for a better future for the three of them and to work to help his family back in Haiti." Docket Item 3-2 at 14. Clerveaux's father also told DHS that "their final destination is New York where his uncle . . . lives, and also [where] his son Shaadoul['s] mother lives." *Id.*

On October 26, 2012, following an interview, Clerveaux and his family members were placed in immigration removal proceedings. Docket Item 3-1 at 2-3. Because he was an immigrant without a valid entry document as required by the Immigration and Nationality Act, Clerveaux was served with a Notice to Appear, charging him with being inadmissible to the United States. *Id.* He was taken into custody on October 26, 2012, but he was released three days later and granted parole. *Id.* at 3.

In April 2015, Clerveaux was arrested in New York City. *Id.* About one year later, in June 2016, he was convicted of attempted second degree criminal possession

---

[1] The respondents have redacted Clerveaux's exact birthday, but the year that he was born is in the record.

of a weapon in violation of New York State law.  *Id.* at 4.  He was sentenced to two years' incarceration and two years' post-release supervision.  *Id.*  Clerveaux was taken into state custody in October 2016 and released in February 2018.  Docket Item 3-1 at 5; Docket Item 5 at 2.

### REMOVAL PROCEEDINGS

Clerveaux's removal proceedings were continued several times between March 2013 and January 2015, Docket Item 3-1 at 3, and again between December 2016 and January 2018, *id.* at 4-5.  On January 18, 2018, Immigration Judge Roger F. Sagerman ordered Clerveaux removed to Haiti, Docket Item 3-2 at 2, and in March 2018, DHS requested a travel document from Haiti for Clerveaux, Docket Item 3-1 at 5.

Clerveaux's DHS charter flight to Haiti was scheduled to depart on March 20, 2018, but on March 14, 2018, Clerveaux appealed the Immigration Judge's removal order to the Board of Immigration Appeals ("BIA").  *Id.*  The BIA accepted Clerveaux's late appeal, and DHS cancelled his flight to Haiti.  *Id.* at 6.

The BIA has not acted on Clerveaux's appeal since then.  At oral argument, the government candidly explained that Clerveaux's case was inadvertently designated a nondetained case and therefore not handled as expeditiously as it should have been.[2]

### DETENTION-RELATED PROCEEDINGS

In the meantime, on February 27, 2018, DHS had taken Clerveaux into custody after he completed serving his New York state sentence.  Docket Item 3-1 at 5.

---

[2] As the government explained at oral argument, the BIA puts cases on two different tracks: a "detained case" is essentially on a fast track, while the BIA processes "nondetained cases" more slowly.

Clerveaux remains in custody at the Buffalo Federal Detention Facility pending completion of his immigration removal proceedings. *Id.* at 6. The record includes nothing indicating that anyone has provided Clerveaux with an individualized review of whether his detention is necessary to ameliorate a risk of flight or danger.

## STATUTORY CONTEXT

The respondents' "authority [to detain Clerveaux] in this area derives from the intersection of several statutory provisions." *Barrera-Echavarria v. Rison*, 44 F.3d 1441, 1445 (9th Cir. 1995).

## I.    8 U.S.C. § 1225(b)

The parties do not dispute that Clerveaux's detention is statutorily authorized by 8 U.S.C. § 1225(b). *See* Docket Item 1 at 5-6; Docket Item 4 at 5-9. Under § 1225, "an alien who 'arrives in the United States,' or 'is present' in this country but 'has not been admitted,' is treated as 'an applicant for admission.'" *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) (quoting § 1225(a)(1)). Section 1225(b)(2) "mandate[s] detention of applicants for admission . . . for 'removal proceedings.'" *Id.* at 842 (quoting § 1225(b)(2)) (internal alterations omitted).

## II.   8 U.S.C. § 1182(d)(5)(A)

"[T]here is a specific provision authorizing release from § 1225(b) detention." *Id.* at 844.

> The Attorney General may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the

4

purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A).

## **DISCUSSION**

28 U.S.C. § 2241 "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)(3)). Although the parties agree that Clerveaux's detention is statutorily authorized by 8 U.S.C. § 1225(b), *see* Docket Item 1 at 5-6; Docket Item 4 at 5-9, they disagree about the constitutionality of Clerveaux's continued detention without an individualized hearing addressing his risk of flight or dangerousness, *see* Docket Item 1 at 6-9; Docket Item 4 at 9-15. Clerveaux argues that his "continued detention is in violation of his procedural due process rights." Docket Item 1 at 9. The government disagrees. Docket Item 4 at 9-15. For the following reasons, Clerveaux is entitled to some relief, although not to the extent that Clerveaux argues due process requires.

The Fifth Amendment's Due Process Clause forbids the federal government from depriving any "person . . . of . . . liberty . . . without due process of law." U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). "[G]overnment detention violates that Clause unless the detention is ordered in a *criminal* proceeding with adequate procedural protections . . . or, in certain special and 'narrow' nonpunitive

5

'circumstances,' . . . where a special justification, such as harm-threatening mental illness, outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Id.* (and cases cited therein) (emphasis in original). Other than those unique, special, and narrow circumstances, "[o]nly a jury, acting on proof beyond a reasonable doubt, may take a person's liberty. That promise stands as one of the Constitution's most vital protections against arbitrary government." *United States v. Haymond*, 139 S. Ct. 2369, 2373 (2019) (Gorsuch, J., announcing the judgment of the Court and delivering an opinion).

"Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." *Plyler v. Doe*, 457 U.S. 202, 210 (1982); *see also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) ("It is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.").

The Due Process Clause is not offended by the mandatory detention of aliens—even lawful permanent resident aliens—for the "*brief period necessary* for their removal proceedings." *Demore v. Kim*, 538 U.S. 510, 513 (2003) (emphasis added). But due process may be implicated if that "continued detention bec[omes] unreasonable or unjustified." *Id.* at 532 (Kennedy, J., concurring). For that reason, this Court "has evaluated procedural due process challenges to immigration detention with a two-step inquiry." *Hemans v. Searls*, 2019 WL 955353, at *5 (W.D.N.Y. Feb. 27, 2019); *see also Rosado Valerio v. Barr*, 2019 WL 3017412, at *3 (W.D.N.Y. July 10, 2019); *Fallatah v. Barr*, 2019 WL 2569592, at *3 (W.D.N.Y. June 21, 2019); *Campbell v. Barr*, 2019 WL

2106387, at *4 (W.D.N.Y. May 14, 2019); *Sankara v. Barr*, 2019 WL 1922069, at *6 (W.D.N.Y. Apr. 30, 2019); *Fremont v. Barr*, 2019 WL 1471006, at *4 (W.D.N.Y. Apr. 3, 2019); *Hechavarria v. Sessions*, 2018 WL 5776421, at *9 (W.D.N.Y. Nov. 2, 2018). "As the first step, the Court considers whether the alien's detention has been unreasonably prolonged." *Hemans*, 2019 WL 955353, at *5. "If it has not, then there is no procedural due process violation." *Id.* "But if it has, the Court proceeds to step two and 'identifies the specific dictates of due process.'" *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). If the government has not provided the procedural safeguards required by the Due Process Clause to an alien subject to unreasonably prolonged detention, "then his continued detention violates procedural due process." *Id.*

## I. CLERVEAUX'S UNREASONABLY PROLONGED DETENTION WITHOUT A HEARING

In *Demore*, the Court explicitly noted that "in the majority of cases [that the court analyzed involving detention pending a determination of removability, detention] lasts for less than the 90 days . . . considered presumptively valid in *Zadvydas*." 538 U.S. at 529. Diving even deeper, the Court noted that "in 85% of the cases in which [those] aliens are detained . . . removal proceedings are completed in an average time of 47 days and a median of 30 days." *Id.* And "[i]n the remaining 15% of cases, in which the alien appeals the decision of the Immigration Judge to the [BIA], appeal takes an average of four months, with a median time that is slightly shorter." *Id.* Although there is no bright-line rule in determining whether detention has become unreasonably prolonged, *see Reid v. Donelan*, 2019 WL 2959085, at *10 (D. Mass. July 9, 2019), "courts [are] extremely wary" of concluding that detention is *not* unreasonably prolonged "[a]s detention continues past a year." *See Muse v. Sessions*, 2018 WL 4466052, at *4

(D. Minn. Sept. 18, 2018); *see also Reid*, 2019 WL 2959085, at \*9-\*10 ("detention is likely to be unreasonable if it lasts for more than one year during removal proceedings before the agency, excluding any delays due to the alien's dilatory tactics," but "[t]his one-year period is not a bright line.").

"[W]hen weighing the lawfulness of the continued detention of an alien under the Due Process Clause," several factors determine whether detention is unreasonably prolonged. *Jamal A. v. Whitaker*, 358 F. Supp. 3d. 853, 858-59 (D. Minn. 2019). For example, this Court has considered "(1) the total length of detention to date; (2) the conditions of detention; (3) delays in the removal proceedings caused by the parties; and (4) the likelihood that the removal proceedings will result in a final order of removal." *Hemans*, 2019 WL 955353, at \*6.

First and most important, courts consider the length of detention. "The total length of the detention is the most important factor." *Reid*, 2019 WL 2959085, at \*9. Clerveaux has been in DHS custody since February 27, 2018—about seventeen months, more than four times longer than the four-month average period contemplated in *Demore*. *See* 538 U.S. at 529; *see also Jennings*, 138 S. Ct. at 864 (2018) (Breyer, J., dissenting) (individuals with mental illness "dangerous to themselves or to others may be confined involuntarily . . . [with] the right to review the circumstances at least annually."). As this Court has noted, "courts have found detention shorter than a year to be unreasonably prolonged as part of a procedural due process analysis." *Fremont*, 2019 WL 1471006, at \*4 (and cases cited therein). The length of Clerveaux's detention therefore supports his argument that his detention without an individualized hearing has been unreasonably prolonged.

Second, courts consider the conditions of detention.  Clerveaux notes that he "remains detained at the Buffalo Federal Detention Facility in Batavia, New York." Docket Item 1 at 5.  But neither party has supplied the Court with details about the conditions that Clerveaux faces at that facility.  So this Court cannot address that factor.

Third, courts consider whether either side is responsible for the delay.  The Second Circuit has indicated that this factor weighs against finding detention unreasonable when the alien "has 'substantially prolonged his stay by abusing the processes provided to him,'" but not when "an immigrant . . . simply made use of the statutorily permitted appeals process." *Hechavarria v. Sessions*, 891 F.3d 49, 56 n.6 (2d Cir. 2018) (quoting *Nken v. Holder*, 556 U.S. 418, 436 (2009)); *cf. Reid*, 2019 WL 2959085, at *10 ("Periods of detention directly attributable to an alien's dilatory tactics should not count in determining whether detention has exceeded the one-year mark.").[3]

_____

[3] The government argues at length that "a noncitizen cannot raise due process claims over lengthy detention in removal proceedings that arises due to the noncitizen's own pursuit of legal remedies."  Docket Item 4 at 12-15.  But the government's argument is misplaced.  The cases on which the government relies, such as *Doherty v. Thornburgh*, 943 F.2d 204 (2d Cir. 1991), and *Dor v. Dist. Director, INS*, 891 F.2d 997 (2d Cir. 1989), do not involve procedural due process challenges, but instead involve substantive due process challenges to the length of detention notwithstanding the process provided.  As this Court has explained, "the court's conclusion in *Doherty* that the alien's inordinately-long detention did not inherently violate his substantive due process rights relied on 'consistent administrative and judicial findings that he presented an exceptionally poor bail risk.'"  *Campbell v. Barr*, 2019 WL 2106387, at *6 (W.D.N.Y. May 14, 2019) (quoting *Doherty*, 943 F.2d at 211).  In this case, this Court is not considering whether Clerveaux's seventeen-month detention is so manifestly unreasonable that his release is required regardless of whether the government has evidence that he is, for example, a danger or a flight risk.  *Cf. United States v. Salerno*, 481 U.S. 739, 747 n.4 (1987).  Instead, this Court considers only whether—seventeen months into Clerveaux's detention—the government must finally demonstrate to someone that there is some evidence that Clerveaux's detention serves some purpose.

Here, the record indicates that Clerveaux's initial removal hearing was delayed several times, usually at Clerveaux's request but sometimes at the request of the government. Under the circumstances, this Court cannot say that those early continuances rise to the level of abuse of the process. *See Hechavarria*, 891 F.3d at 56 n.6. So any delays until and including Clerveaux's hearing do not cut in favor of either side.

But the post-hearing delay is a different story. At oral argument, the government conceded that since Clerveaux appealed his removal, his case has been pending before the BIA for what "seems to be an exorbitantly long period of time." Counsel for the government therefore looked into this and learned that Clerveaux's BIA appeal had inadvertently been designated as a "nondetained case." *See* note 2, *supra*, and accompanying text. As a result, his proceedings are taking longer than they should have and would have if the government had correctly "tracked" Clerveaux's BIA appeal. Counsel for Clerveaux noted that he was not to blame, saying that "we did check the box that he is detained." Therefore, on those facts and as the government implicitly concedes, the recent lengthy delay is in large part attributable to the government. And for that reason, this factor weighs in favor of concluding that Clerveaux's detention is unreasonably prolonged. *See Reid*, 2019 WL 2959085, at *10 ("an alien's individual circumstances would render mandatory detention of less than one year unreasonable if the Government unreasonably delays or the case languishes on a docket.").

Finally, courts consider the likelihood that the removal proceedings will result in a final order of removal. This Court declines to weigh the merits of Clerveaux's claims pending before the BIA, which may be appealed from there to the Second Circuit. In

any event, neither side has included much about the substantive issues in its submissions to this Court.

After weighing these factors, this Court concludes with little difficulty that Clerveaux's detention has been unreasonably prolonged. Therefore, this Court turns to the second step of the two-part inquiry—the thorny question of the process constitutionally due to Clerveaux.

## II.    THE PROCESS DUE TO CLERVEAUX

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors": the private interest affected, the government's interests at stake, and the risk of erroneous deprivation of the private interest through the procedures used. *Id.* at 335; *see, e.g.*, *Nelson v. Colorado*, 137 S. Ct. 1249, 1255 (2017).

### A.    The Private Interest Affected.

Clerveaux's interest in his freedom pending the conclusion of his removal proceedings deserves great "weight and gravity." *Addington v. Texas*, 441 U.S. 418, 427 (1979). Clerveaux has an obvious interest in his "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint." *Zadvydas*, 533 U.S. at 690.

Furthermore, the record indicates that Clerveaux's father, mother, and at least one sibling live in this country. *See* Docket Item 3-1 at 2, 14. If Clerveaux chose not to challenge his removal, he would "lose the right to rejoin h[is] immediate family, a right

11

that ranks high among the interests of the individual." *Landon v. Plasencia*, 459 U.S.

21, 34 (1982); *see also Ms. L. v. U.S. Immigration and Customs Enf't*, 302 F. Supp. 3d

1149, 1167 (S.D. Cal. 2018) ("government conduct that arbitrarily tears at the sacred

bond between parent and child" raises Due Process Clause claim).

### B.     The Government's Interests at Stake

The government may have several interests in detaining Clerveaux.  First,

because Clerveaux was paroled into the country without authority to enter, his release

into the United States would implicate the authority of the government to manage who

may enter the country.  Furthermore, the government may have interests in preventing

risk of flight or danger to the community that are served by detaining Clerveaux.  This

Court addresses each of these interests in turn.

### 1.     Clerveaux's Constitutional "Arriving Alien" Status and the Government's Interest in Controlling Admission to the United States

When analyzing the process due to noncitizens, there is a relevant "distinction

between an alien who has effected an entry into the United States and one who has

never entered." *Zadvydas*, 533 U.S. at 693.  After all, if release from physical

confinement means that noncitizens who have never "entered" our country "be released

into American society," *Chi Thon Ngo.*, 192 F.3d at 394 (quoting *Barrera-Eschavarria*,

44 F.3d at 1448), release may "'ultimately result in our losing control over our borders,'"

*id.* (quoting *Jean v. Nelson*, 727 F.2d 957, 975 (11th Cir. 1984)).  Therefore, the nature

of protection under the Due Process Clause "may vary depending upon [a noncitizen's]

status and circumstance." *Zadvydas*, 533 U.S. at 694.

Aliens—whether in the United States legally or illegally—"apprehended within the territorial boundaries of this country, are entitled to [greater] due process protections" than arriving aliens. *See Padilla v. U.S. Immigration and Customs Enf't*, 2019 WL 2766720, at *6 (W.D. Wash. July 2, 2019); *see also Augustin v. Sava*, 735 F.2d 32, 36 n. 10 (2d Cir. 1984) (alien who made illegal entry in Florida before being detained has greater constitutional rights than alien petitioning for initial admission). Non-arriving aliens include lawful permanent residents, noncitizens who have valid visas, noncitizens who have overstayed their visas, and noncitizens who have otherwise entered the territorial boundaries without inspection by a federal agent. *See Padilla*, 2019 WL 2766720, at *6; *see also Wang*, 320 F.3d at 134, 146-47 (applying substantive due process analysis from *Zadvydas* to alien who "entered the United States . . . without being lawfully admitted or paroled" to conclude that "his continued detention . . . does not violate the Due Process Clause."). "[A]n alien on the threshold of initial entry," on the other hand, "stands on a different footing" when it comes to due process rights. *Mezei*, 345 U.S. at 212.

Relying on *Mezei*, the government argues that Clerveaux's continued detention without a bond hearing is constitutional simply because he is an arriving alien. Docket Item 4 at 9-11. According to the government, "[o]nly those who have entered the United States—which[, they contend,] arriving aliens have not—accrue constitutional protections consistent with being admitted to the United States." *Id.* at 10. So for the government, an arriving alien has virtually no due process rights.

The government is correct in at least one respect: the fact that Clerveaux was temporarily paroled into the United States does not mean that, under the Immigration

and Nationality Act, he was "admitted."  8 U.S.C. § 1182(d)(5)(A).  Indeed, the statute explicitly provides that "parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall . . . have been served the alien shall forthwith return or be returned to the custody from which he was paroled."  *Id.*

But Congress may not dictate what it means to be an "alien on the threshold of initial entry" for *constitutional* purposes.  *See Mezei*, 345 U.S. at 212; *cf. Sessions v. Dimaya*, 138 S. Ct. 1204, 1229 (2018) (Gorsuch, J., concurring) (quoting *Giaccio v. Pennsylvania*, 382 U.S. 399, 402 (1966)) ("[D]ue process protections . . . are 'not to be avoided by the simple label [the government] chooses to fasten upon its conduct or its statute.'").  And there is good reason that Clerveaux should have more than the minimal due process guarantees of an "arriving alien."

An alien's "constitutional status changes" after the alien "begins to develop the ties that go with permanent residence."  *Landon*, 459 U.S. at 32.  Here, Clerveaux lived in the country—"paroled" with the government's blessing—for nearly two-and-a-half years before his arrest in April 2015.  *See* Docket Item 3-1 at 3.  Although he technically is still an "arriving alien," there is a strong argument that he should have more constitutional protections than an alien detained at the border before first stepping foot on United States soil.  *See Zadvydas*, 533 U.S. at 721 (Kennedy, J., dissenting) ("Removable and excludable aliens are situated differently before an order of removal is entered; the removable alien, *by virtue of his continued presence here*, possesses an interest in remaining, while the excludable alien seeks only the privilege of entry.") (emphasis added).  Indeed, it is difficult to digest that for constitutional purposes Clerveaux is an "alien on the threshold of initial entry," *Mezei*, 345 U.S. at 212, or even

someone "who has been here for too brief a period to have become, in any real sense, a part of our population," *Yamataya v. Fisher*, 189 U.S. 86, 100 (1903); *see also Kwai Fun Wong v. United States*, 373 F.3d 952, 972-73 (9th Cir. 2004) ("The decisions of courts confronted with the everyday reality of the great number of non-admitted aliens living and working in the American community reflect an understanding that such aliens are undeniably 'persons' entitled to constitutional protection.").

> It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders. . . . But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.

*Zadvydas*, 533 U.S. at 693 (and cases cited therein).[4]

Nevertheless, in *Guzman v. Tippy*, 130 F.3d 64, 66 (2d Cir. 1997), the Second Circuit concluded that "[i]ndefinite detention of excludable[, that is, "arriving,"[5]] aliens does not violate due process." What is more, the alien who the Court determined—for constitutional purposes—to be an "arriving alien" stood on footing quite similar to Clerveaux's. In *Guzman*, the petitioner had "arrived in the United States in 1980 from Cuba by way of the Mariel boatlift."[6] *Id.* at 65. "Upon entry into the United States, [he]

---

[4] What is more, the Constitution may afford Clerveaux greater protection because he was a minor when he arrived here. *See Plyler v. Doe*, 457 U.S. 202, 219-20 (1982). As a minor arriving with his adult father, Clerveaux had limited or no ability to "affect [his] parent['s] conduct nor [his] own status" as a statutory arriving alien. *Id.* at 220 (quoting *Trimble v. Gordon*, 430 U.S. 762, 770 (1977)).

[5] Consistent with the statutory designations that existed at the time, the Second Circuit referred to him as an "excludable alien" as opposed to an "arriving alien." *See Guzman v. Tippy*, 130 F.3d 64, 66 (2d Cir. 1997); *see also Chi Thon Ngo v. I.N.S.*, 192 F.3d 390, 394 n.4 (3d Cir. 1999) (describing changes in terminology).

[6] The Mariel Boatlift is discussed in greater detail *infra* at 24.

was paroled to a sponsor." *Id.* "In 1987, [he] was convicted for second degree murder . . . and sentenced to eight years' imprisonment." *Id.* "His immigration parole was revoked at this time as contrary to the public interest." *Id.* "Upon completion of his sentence, in 1992, he was released into the custody of the Immigration and Naturalization Services (INS) for an exclusion hearing." *Id.* "In May of 1992, after the exclusion hearing, Guzman was ordered excluded," but "Cuba refused to admit [him] and no other country would agree to accept him." *Id.* Because—despite Guzman's seven-year parole living freely in the United States—he was, constitutionally, an "arriving alien," the Second Circuit concluded that his indefinite detention did not inherently violate the substantive guarantees implicit in the Due Process Clause. *See id.*

"Lower courts are bound by Second Circuit precedent 'unless it is expressly or implicitly overruled' by the Supreme Court or an en banc panel of the Second Circuit." *In re South African Apartheid Litigation*, 15 F. Supp. 3d 454, 459 (S.D.N.Y. 2014) (quoting *World Wrestling Entm't Inc. v. Jakks Pac., Inc.*, 425 F. Supp. 2d 484, 499 (S.D.N.Y. 2006)). And no intervening Supreme Court case clearly overcomes the conclusion that *Guzman* requires this Court to treat Clerveaux's Due Process Clause claim as if it were brought by an arriving alien who was not paroled into this country. *See Napoles v. I.N.S.*, 278 F. Supp. 2d 272, 277 (D. Conn. 2003) ("Even though this Court seriously questions the vitality of *Guzman* after *Zadvydas* and *Wang*, this Court is bound by *Guzman*'s holding.").

Clerveaux "notes that *Guzman* was decided by the Second Circuit four years before the monumental decision in *Zadvydas* . . . which rejected the underlying holding

16

of *[Mezei]*." Docket Item 14 at 1. But in *Zadvydas* , the Court explicitly limited its

holding in a way directly relevant here: "We deal here with aliens who were admitted to

the United States but subsequently ordered removed. *Aliens who have not yet gained*

*initial admission to this country would present a very different question*." 533 U.S. at

682 (emphasis added).[7]

What is more, the Court in *Zadvydas* referred to an older case where "despite

nine years' presence in the United States, an 'excluded' alien 'was still in theory of law

at the boundary line and had gained no foothold into the United States.'" 533 U.S. at

693 (quoting *Kaplan v. Tod*, 267 U.S. 228, 230 (1925)).[8]  So under the current

---

[7] In *Clark v. Martinez*, 543 U.S. 371 (2005), the Supreme Court clarified that the
limits on detention recognized in *Zadvydas did* apply to arriving aliens, even though "the
constitutional concerns that influenced [its] statutory construction in *Zadvydas* are not
present for [arriving] aliens . . . who have not been admitted to the United States." *Id.* at
380.  In *Clark*, the Court reasoned that it could not "justify giving the *same* [statutory]
detention provision a different meaning when such aliens are involved" and being held
under the same statutory authority. *Id.* (emphasis in original).  So that decision did not
rest on constitutional grounds, and the Supreme Court has not clarified whether
Congress may change the statute—to authorize the indefinite detention of arriving
aliens who cannot be deported—without violating the Constitution. *See id.*  And if
Congress authorized the indefinite detention of arriving aliens without an intervening
Supreme Court decision, *Guzman* would continue to be binding Second Circuit
precedent regarding the substantive due process rights of those aliens.

[8] *Kaplan* supports *Guzman*'s implicit conclusion that arriving aliens must be
treated similarly regardless of whether they have been paroled into the country for some
extended period.  But there are reasons to question the reach of that constitutional
holding.  Although the petitioner in *Kaplan* raised both statutory and due process claims,
the Court's brief analysis focused only on her statutory claim.  *See Kaplan v. Tod*, 267
U.S. 228, 258 (1925) ("She never has been dwelling in the United States *within the
meaning of the Act*," and she "never has begun to reside permanently in the United
States *within the later Act*") (emphasis added); *see also Leng May Ma v. Barber*, 357
U.S. 185, 189 (1958) ("questions posed" in *Kaplan* involved the "meaning of a
naturalization statute").  Even assuming that *Kaplan* does interpret the Due Process
Clause and has not "been overruled in the court of history," *Trump v. Hawaii*, 138 S. Ct.
2392, 2423 (2018) (Roberts, C.J.) (discussing *Korematsu v. United States*, 323 U.S.
214 (1944)), the fact that the petitioner's "[d]eportation necessarily was suspended" in
light of World War I places the context of the government's conduct in that case on a

precedent of the Second Circuit, read in light of *Zadvydas*, arriving aliens paroled into the United States pending a decision regarding their admission and arriving aliens still at the border both have less process due them than those who had first "been apprehended within the territorial boundaries of this country."  *See Padilla*, 2019 WL 2766720, at *6.[9]  Therefore, Clerveaux's claim implicates the government's strong interest in controlling entry to the United States.

## 2.  The Government's Other Interests in Detention

The government may have other strong interests in Clerveaux's detention.  "The government's interest in preventing crime by arrestees is both legitimate and compelling."  *United States v. Salerno*, 481 U.S. 739, 749 (1987).  And general concerns about the risk of flight highlight the government's compelling interest in preserving its "ability to later carry out its broader responsibilities over immigration matters."  *Doherty v. Thornburgh*, 943 F.2d 204, 211 (2d Cir. 1991).[10]

---

much different footing than its conduct in this case and *Guzman*, which take and took place during peacetime.  *See Kaplan*, 267 U.S. at 229.

[9] Although it may be counterintuitive, an alien who sneaks across the border therefore is entitled to more constitutional protection than an alien who tries to enter lawfully at a border crossing, legally seeks admission, and is paroled into the country. *See Augustin v. Sava*, 735 F.2d 32, 36 n.11 (2d Cir. 1984).

[10] In all immigration detention due process cases, the government also has an interest in avoiding "the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  But avoiding the administrative burdens associated with hearings support the government's constitutional authority to detain all aliens subject to deportation proceedings without any process only for a "brief period."  *Demore v. Kim*, 538 U.S. 510, 513, 518 (2003).  In this case, that period has elapsed.  *See supra*, at 7-11 (discussing how Clerveaux's detention has been unreasonably prolonged).

**C.    The Risk of Erroneous Deprivation of Clerveaux's Interests Through the Procedures Used**

The record in this case indicates that despite Clerveaux's prolonged detention, DHS has made no individualized findings regarding the reasons for his detention. "[B]oth removable and inadmissible aliens are entitled to be free from detention that is arbitrary or capricious." *Zadvydas*, 533 U.S. at 721 (Kennedy, J., dissenting). So without anyone looking at why exactly Clerveaux is being detained and whether it would make more sense to release him pending the completion of his immigration proceedings, the risk of erroneous deprivation of his liberty is indeed high.

The government suggests that Clerveaux has had a sufficient *opportunity* to be heard: the opportunity to apply for discretionary parole under 8 U.S.C. § 1182(d)(5), which he has not done. *See* Docket Item 16. But "[t]he Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). A procedure whereby long-term detainees, many without counsel, are saddled with the responsibility of determining how to apply for parole only slightly reduces the risk of erroneous deprivation of their interest in being free from arbitrary imprisonment.[11]

---

[11] What is more, nothing in the record indicates that arriving aliens subject to § 1225(b) detention after serving a state prison sentence even receive any notice that they can petition for parole under § 1182(d)(5). The government has provided a copy of ICE Directive No. 11002.1, which provides that "[a]s soon as practicable following a credible fear determination by USCID for an arriving alien detained by" DHS Immigration and Customs Enforcement Detention and Removal Operations ("DRO"), "DRO shall provide [an] alien with [a] *Parole Advisal and Scheduling Notification*." Docket Item 16-2 at 3. Because Clerveaux was released on parole with his father when he was sixteen or seventeen years old on October 29, 2012, *see* Docket Item 3-1 at 3, his credible fear determination would have been made then, and ICE Directive 11002.1 required notice of parole opportunities at that time—not since his return to DHS custody

And even if a long-term detainee somehow figures out that he can apply for parole, the government suggests that the parole application in cases like Clerveaux's would be governed by 8 C.F.R. § 212.5. Docket Items 16 at 2, 16-1 at 2. That regulation places extraordinarily broad discretion over whether to release a detainee in the hands of DHS officials without requiring any sort of rigorous review. *See id.* The regulation does list several classes of aliens for whom release "would generally be justified only on a case-by-case basis," such as aliens with "serious medical conditions in which continued detention would not be appropriate," "[w]omen who have been medically certified as pregnant," or certain juveniles. *Id.* § 212.5(b). Even if Clerveaux belonged to one of those classes—which he does not—it would be difficult to estimate the likelihood of his release and therefore the risk of erroneous deprivation of his interests using the parole application process under § 212.5. And because Clerveaux is not in a § 212.5(b) class, the risk of erroneously depriving him of his liberty interest is even greater.

In sum, there is indeed a risk of erroneous deprivation of Clerveaux's liberty interest under the procedures used thus far and available to him.

### D.       Procedural Due Process Required For Prolonged Detention of Arriving Aliens

Having established that the Due Process Clause applies equally to Clerveaux as to other arriving aliens, "the question remains what process is due." *Morrissey v.*

---

in February 2018. *See* Docket Item 16-2 at 3. Indeed, the government concedes that "[i]n light of [Clerveaux's] criminal conviction, he is no longer subject to the Directive." Docket Item 16-1 at 2. So even if due process required only notice of an opportunity to apply for parole, that did not happen here.

*Brewer*, 408 U.S. 471, 481 (1972). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong*, 380 U.S. at 552). But "not all situations calling for procedural safeguards call for the same kind of procedure." *Morrissey*, 408 U.S. at 481. "[A] balancing of the competing interests at stake" and a comparison to similar cases dictate the appropriate process due. *See Loudermill*, 470 U.S. at 542.

### 1. Clerveaux is Entitled to Some Due Process Rights

In *Mezei*, the Supreme Court declared that "'[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.'" 345 U.S. at 212 (quoting *United States ex rel. Knauff v. Shaughnessy*, 388 U.S. 537, 544 (1950)). Relying on that language, the government argues that—contrary to the plain text of the Due Process Clause—Clerveaux "[l]acks constitutional due process rights." Docket Item 13 at 3. But the government's argument erroneously "treat[s] judicial opinions as if they were statutes, divorc[es] a passing comment from its context, ignor[es] all that came before and after, and treat[s] an isolated phrase as if it were controlling." *Gundy v. United States*, 139 S. Ct. 2116, 2139 (2019) (Gorsuch, J., dissenting). Indeed, in the year following *Mezei*, the Supreme Court declared that even as to "[p]olicies pertaining to the entry of aliens . . . the Executive Branch of the Government must respect the procedural safeguards of due process." *Galvan v. Press*, 347 U.S. 522, 531 (1954).

As Justice Breyer recently explained, in *Mezei*, the Court "denied Mezei a bail proceeding . . . *after* the Attorney General had already found, on an individualized basis, not only that Mezei was a security risk and consequently not entitled to either admission

or bail, but also that he could be denied a hearing on the matter because the basis for that decision could not be disclosed without harm to national security." *Jennings*, 138 S. Ct. at 867 (Breyer, J., dissenting) (citing *Mezei*, 345 U.S. at 208-09). In other words, the government's decision to continue holding Mezei was made after "individualized findings." *Id.* Indeed, when *Mezei* was decided, "[p]hysical detention of aliens [was] the exception, not the rule, and [was] generally employed only as to security risks or those likely to abscond"—policies reflecting "the humane qualities of an enlightened civilization." *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958) (Clark, J.) (citing Annual Reports, Immigration and Naturalization Service, 1955, pp. 5-6; 1956, pp.5-6).[12]

Although aliens "on the threshold of initial entry" may have fewer due process rights than other "persons," the government's argument—that *Mezei*'s dictum that "[w]hatever the procedure authorized by Congress is due process as far as an alien denied entry is concerned," 345 U.S. at 212, is to be taken literally—cannot be correct. As Justice Scalia explained, arriving aliens "could not be subjected to the punishment of hard labor without a judicial trial." *Zadvydas*, 533 U.S. at 704 (Scalia, J., dissenting). He was "sure [that those aliens] cannot be tortured, as well." *Id.* And in the words of Justice Marshall, *Mezei*'s "broad dicta . . . can withstand neither the weight of logic nor that of principle, and has never been incorporated into the fabric of our constitutional jurisprudence." *Jean v. Nelson*, 472 U.S. 846, 869 (1985) (Marshall, J., dissenting); *see*

---

[12] Moreover, "*Mezei*—decided at the height of the Cold War—'explicitly tailored its holding to the national security context.'" *Bermudez Paiz v. Decker*, 2018 WL 6928794, at *11 (S.D.N.Y. Dec. 27, 2018) (quoting *Lett v. Decker*, 346 F. Supp. 3d 379, 386 (S.D.N.Y. 2018)). The Court emphasized that "an exclusion proceeding grounded on danger to the national security . . . presents different considerations' than a typical deportation proceeding." *Lett*, 346 F. Supp. 3d at 386 (quoting *Mezei*, 345 U.S. at 215-16).

*also id.* at 874 ("Surely we would not condone mass starvation" of arriving aliens); *Garza v. Hargan*, 2017 WL 9854555, at *6 (D.C. Cir. Oct. 20, 2017) (Millett, J., dissenting) ("If true, [the argument that arriving aliens are not 'persons'] would mean that . . . [t]hey could, if raped by government officials who hold them in detention, then be forced to carry any pregnancies to term"), *adopted by en banc order of court*, 874 F.3d 735 (D.C. Cir. 2017), *vacated as moot*, 138 S. Ct. 1790 (2018); *Lynch v. Cannatella*, 810 F.2d 1363, 1374 (5th Cir. 1987) ("We therefore hold that, whatever due process rights excludable aliens may be denied by virtue of their status, they are entitled under the due process clauses of the fifth and fourteenth amendments to be free of gross physical abuse at the hands of state or federal officials."). Indeed, "*Mezei* has been criticized as the nadir of the law with which the opinion dealt." *Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382, 1388 (10th Cir. 1981).

This Court's determination that Clerveaux has some due process rights also has support in several Court of Appeals cases dealing with the plight of the Mariel Cubans. Those cases, including *Guzman*, either implicitly or explicitly reject the government's contention that arriving aliens have no procedural due process rights. *See, e.g., Rosales-Garcia v. Holland*, 238 F.3d 704, 721-27 (6th Cir. 2001), *vacated and remanded for reconsideration in light of Zadvydas by* 534 U.S. 1063 (2001); *Chi Thon Ngo*, 192 F.3d at 397-99; *Guzman*, 130 F.3d at 66; *Barrera-Eschavarria*, 44 F.3d at 1450; *Gisbert v. U.S. Atty. Gen.*, 988 F.2d 1437, 1443-44 (5th Cir. 1993); *Palma v. Verdeyen*, 676 F.2d 100, 104-05 (4th Cir. 1982); *Rodriguez-Fernandez*, 654 F.2d at 1386-90. As the Third Circuit has explained, *Mezei* remains "a governing precedent."

*Chi Thon Ngo.*, 192 F.3d at 396. But *Mezei*'s dictum has not been applied literally; instead, it "has been applied, with some modifications." *Id.*

Looking at the "Mariel Boatlift" cases sheds some light on how to balance Clerveaux's interests against the government's. The Mariel Boatlift occurred in 1980 when

> some 125,000 Cuban aliens arrived without visas in Florida aboard a flotilla of small boats. Cuban authorities had taken advantage of this exodus to give criminals the option to remain in prison or to leave for the United States. Immigration officers found that about 25,000 of the arriving aliens admitted some criminal history, but only about 2,000 were deemed to have backgrounds serious enough to warrant continued detention. Most of the other aliens were promptly paroled under provisions of the Immigration and Nationality Act, 8 U.S.C. § 1182(d)(5).

*Palma*, 676 F.2d at 101.[13] A short time later, Mariel Cubans—whose prospects of returning to Cuba were nearly nonexistent—challenged the government's constitutional authority to detain them. In 1981, the Tenth Circuit construed the law to forbid indefinite detention of aliens, citing the "serious constitutional questions involved if the statute were construed differently." *Rodriguez-Fernandez*, 654 F.2d at 1386. Judge McWilliams dissented. *Id.* at 1390-92. In his view, the individual circumstances of the petitioner in that case were such that the government did not abuse its discretion in continuing to detain him. *Id.* at 1391. But the government would abuse its discretion if it refused to release "others who are dissimilarly situated." *Id.* He called for, at the very least, individualized decisions regarding the circumstances of each alien subject to prolonged detention. *Id.*

---

[13] The incident is referred to as the "Mariel boatlift" because the Cubans "arrived in Florida in open boats from the Cuban port of Mariel." *Guzman v. Tippy*, 130 F.3d at 65.

In the same month that the Tenth Circuit issued its decision, the government adopted some procedures to ensure that detained Mariel Cubans received individualized determinations, including an opportunity to be heard. *Palma*, 676 F.2d at 102. As described in 1982, the plan

> calls first for a review of the detainee's file. If parole cannot be recommended on that basis, a panel composed of Immigration and Department of Justice officials personally interviews the detainee. The panel must determine if the detainee should be recommended for parole, considering such factors as his past criminal history, his record of disciplinary infractions while in custody, and his cooperativeness in institutional work and vocational programs. Release cannot be recommended unless the panel members agree that (1) the detainee is presently a nonviolent person, (2) he is likely to remain nonviolent, and (3) he is unlikely to commit any criminal offense following his release. Panel recommendations are not conclusive but must be approved by the Commissioner of the Immigration and Naturalization Service. The plan requires subsequent review of a detainee within one year after a decision denying him parole, and it allows earlier review on the recommendation of the staff of the institution where the alien is detained. The plan states that after all detainees have received subsequent reviews, the procedures will be reevaluated for the purpose of determining future review of the remaining detainees.

*Id.* As the Third Circuit has found, "[i]t is significant . . . that the [Tenth Circuit's] decision in *Rodriguez-Fernandez* was handed down before the promulgation of regulations providing parole review for Mariel Cubans." *Chi Thon Ngo*, 192 F.3d at 397. After that, "[c]ourts have looked to the existence of those procedures to turn back due process challenges." *Id.*

With these procedures in place, the Fourth Circuit determined that the government had individually "determined that [a petitioner] . . . [was] not suitable for parole." *Palma*, 676 F.2d at 105. And assuming without deciding that it could review that decision for abuse of discretion, the court found that the government had not abused its discretion to deny parole because the government had issued a written

decision explaining its decision not to parole the petitioner based on several specific "disciplinary infractions." *Id.*

In 1993, the Fifth Circuit considered another challenge to the continued detention of Mariel Cubans. *Gisbert*, 988 F.2d at 1440.[14] More specifically, the court considered both substantive and procedural due process challenges to their indefinite detention. *Id.* at 1441-44. The court did not find that arriving aliens had no due process rights. Instead, the court determined that the indefinite detention of Mariel Cubans did not violate substantive due process because the detention was not "punishment" and was reasonably tailored to achieve a sufficient regulatory purpose: "protecting society from a potentially dangerous alien." *Id.* at 1442. Although the court relied on *Mezei* to decide that Mariel Cubans did not have "a general right to the procedural due process guarantees of the Fifth Amendment," *id.* at 1443, it also noted

> [f]ederal regulations [that] exist[ed] that set forth explicitly the procedure for parole determinations concerning the Mariel Cubans. 8 C.F.R. §§ 212.12, 212.13. The section 212.12 regulations establish findings that must be made before recommending parole, factors to be considered in determining whether to recommend parole, and the procedures for review hearings. . . . Petitioners do not contend that these procedures were not followed here.

*Id.* at 1443-44. Although the Fifth Circuit provided in a footnote that "the establishment by the regulations of procedures to guide decision making in this area does not create any general due process rights," *id.* at 1443 n.11, the discussion of both those provisions and the petitioners' decision not to argue that they were violated suggests that some due process standard applied.

---

[14] It is unclear why so much time passed between the first two Mariel Cuban decisions and *Gisbert*.

In 1995, in *Barrera-Eschavarria v. Rison*, the Ninth Circuit determined that "[w]hile excludable aliens might . . . enjoy some constitutional protections, . . . applicable Supreme Court precedent squarely precludes a conclusion that they have a constitutional right to be free from detention, even for an extended time." 44 F.3d at 1449. But again, the court relied on the robust procedures in place to ensure periodic individualized review of the purposes behind the continued detention of each detainee. *See id.* at 1450. In *Barrera-Eschavarria*, the petitioner had "received a special one-time review by a Justice Department panel comprised of non-INS officials." *Id.* Moreover, under the regulations that applied to him, the petitioner's "case continue[d] to be reviewed at least annually to determine if he meets established criteria for granting parole." *Id.* "At his annual reviews, [the petitioner] can be assisted by a representative and has the opportunity to present oral and written information in support of his release." *Id.* "Factors considered in these reviews include participation in educational and vocational programs, ties to the community, criminal and disciplinary records, psychological evaluations, and other information concerning [his] fitness to enter American society." *Id.* "Thus, [the petitioner] ha[d] the opportunity on an annual basis to show that since the previous review he ha[d] changed his behavior and would no longer constitute a danger to society if paroled." *Id.* "When viewed in this light, as a series of one-year periods of detention followed by an opportunity to plead his case anew, [the Ninth Circuit had] no difficulty concluding that [the petitioner's] detention [was] constitutional under *Mezei*." *Id.*

In 1997, the Second Circuit "join[ed its] sister circuits in reaching the same conclusion[s]" as those courts. *Guzman*, 130 F.3d at 65. It too "looked to the existence

of those procedures to turn back [a] due process challenge[]" by a Mariel Cuban. *Chi Thon Ngo*, 192 F.3d at 397 (citing *Guzman*, 130 F.3d at 66). Specifically, the Second Circuit noted that

> Guzman has regularly been given an opportunity to plead his case under the Cuban Review Plan, which provides for the annual evaluation of detainees to reassess their eligibility for parole. 8 C.F.R. § 212.12. When the INS review panel finds that the detainee is (1) currently nonviolent; (2) likely to remain nonviolent; (3) not likely to be a threat to the community; and (4) not likely to violate the conditions of parole, he will be recommended for release. *See* 8 C.F.R. § 212.12(d)(2). Under the plan, a detained Mariel Cuban who is not granted parole after a review of the record is entitled to a personal interview with the review panel. *See* 8 C.F.R. § 212.12(d)(4)(ii). Guzman has had, and will continue to have, the opportunity to plead his case to the INS review panel, and to appeal any denials he has received.

*Guzman*, 130 F.3d at 66.

In 1999, in *Chi Thon Ngo*, the Third Circuit synthesized all the decisions in this area and concluded that the "case law holds there is no constitutional impediment to the indefinite detention of an alien with a criminal record under a final order of exclusion, deportation, or removal if (1) there is a possibility of his eventual departure; (2) there are adequate and reasonable provisions for the grant of parole; and (3) detention is necessary to prevent a risk of flight or a threat to the community." 192 F.3d at 397. The Third Circuit determined that such criteria apply whenever "detention is prolonged." *Id.* at 398. That is because for any detainee subject to prolonged detention, "[i]t overworks legal fiction to say that one is free in law when by the commonest of common sense he is bound." *Id.* (quoting *Mezei*, 345 U.S. at 220 (Jackson, J., dissenting)). And "[i]t is similarly unrealistic to believe that [certain immigration] detainees are not actually being 'punished' in some sense for their past conduct." *Id.* Therefore,

> [w]hen detention is prolonged, special care must be exercised so that the confinement does not continue beyond the time when the original justifications for custody are no longer tenable. The fact that some aliens

posed a risk of flight in the past does not mean they will forever fall into that category. Similarly, presenting danger to the community at one point by committing crime does not place them forever beyond redemption.

Measures must be taken to assess the risk of flight and danger to the community on a current basis. The stakes are high and we emphasize that grudging and perfunctory review is not enough to satisfy the due process right to liberty, even for [excludable] aliens. . . . Due process is not satisfied . . . by rubberstamp denials based on temporally distant offenses. The process due even to excludable aliens requires an opportunity for an evaluation of the individual's current threat to the community and his risk of flight.

*Id.*

The petitioner in *Chi Thon Ngo*, like Clerveaux, had been paroled into the United States. *Id.* at 392.[15] But he was *not* a Mariel Cuban, and he therefore was not subject to the procedures available under the Cuban Review Plan, 8 C.F.R. § 212.12. *See id.* at 398-99. Nevertheless, "[a]fter oral argument, . . . the INS announced detailed Interim Rules for detainees such as [Chi Thon Ngo], and its intention to promulgate regulations to the same effect." *Id.* at 399. Those

rules have some similarities to those available for the Mariel Cubans. The Interim Rules include (1) written notice to the alien thirty days prior to the custody review advising that he may present information supporting a release; (2) the right to representation by counsel or other individuals; (3) the opportunity for an annual personal interview; (4) written explanations for a custody decision; (5) the opportunity for review by INS headquarters; (6) reviews every six months; (7) a refusal to presume continued detention based on criminal history; and other provisions.

*Id.* The Third Circuit "reviewed these rules carefully and conclude[d] that conscientiously applied, they provide reasonable assurance of fair consideration of a petitioner's application for parole pending removal." *Id.* "So long as petitioner will

---

[15] Chi Thon Ngo was "a native of Vietnam who was paroled . . . into the United States as a refugee in 1982." *Chi Thon Ngo v. I.N.S.*, 192 F.3d 390, 392 (3d. Cir. 1999).

receive searching periodic reviews, the prospect of indefinite detention without hope for parole will be eliminated. In these circumstances, due process will be satisfied." *Id.*[16]

Considering all these cases, this Court concludes that the Due Process Clause requires that an "arriving alien" who has been subjected to unreasonably prolonged detention receive a periodic individualized "rigorous review of his eligibility" for release. *Id.* at 399; *see Guzman*, 130 F.3d at 66. Any such review must "provide reasonable assurance of fair consideration of" release from detention. *Chi Thon Ngo*, 192 F.3d at 399; *see Guzman*, 130 F.3d at 66. Indeed, at least one district court in this circuit has concluded that *Guzman* means that an arriving alien may be detained for a prolonged period only "so long as he has the opportunity for periodic parole reviews." *Napoles v.*, 278 F. Supp. 2d at 277.

This Court recognizes that some courts in this circuit have recently found that due process requires the government to provide a bond hearing with stronger procedural protections for arriving aliens who have endured prolonged detention. *See De Ming Wang v. Brophy*, 2019 WL 112346, at *1 (W.D.N.Y. Jan. 4, 2019) (ordering "an individualized bond hearing in which the Government must prove by clear and convincing evidence that Petitioner's continued detention is justified based on flight risk

---

[16] In *Ho v. Greene*, 204 F.3d 1045 (10th Cir. 2000), the Tenth Circuit concluded that statutory changes enacted since *Rodriguez-Fernandez* had authorized the government to indefinitely detain aliens who had been ordered removed. *Id.* at 1055. Over a dissent, the court also determined that indefinite detention did not violate due process. *Id.* at 1057-60.

In 2001, in *Rosales-Garcia v. Holland*, the Sixth Circuit broke the trend and determined that regardless of the "periodic review of [detainee] parole status," indefinite detention with limited prospect of release "crossed the line from permissive regulatory confinement to impermissible punishment without trial" and violated the substantive due process rights of immigration detainees. 238 F.3d at 725-27 (6th Cir. 2001).

or danger to the community"); *Kouadio v. Decker*, 352 F. Supp. 3d 235, 241 (S.D.N.Y. 2018) (same); *Lett v. Decker*, 346 F. Supp. 3d 379, 388-89 (S.D.N.Y. 2018) (same); *Perez v. Decker*, 2018 WL 3991497 at *6-*7 (S.D.N.Y. Aug. 20, 2018) (same); *Brissett v. Decker*, 324 F. Supp. 3d 444, 455 (S.D.N.Y. 2018) (same). Although some of these decisions distinguish *Mezei*, *see, e.g.*, *Lett*, 346 F. Supp. 3d at 385-86, none appear to address the implications of *Guzman*.[17]

Another court in this circuit has determined that "*Mezei* dictates that due process does not require" bond hearings for arriving aliens. *See Poonjani v. Shanahan*, 319 F. Supp. 3d 644 (S.D.N.Y. 2018). But that case also does not address the Mariel Cuban cases and their suggestion that arriving aliens subject to prolonged detention deserve some opportunity to be heard regarding the justifications for their detention. *See id.*

Clerveaux argues that his prolonged detention under 8 U.S.C § 1225(b) "without an opportunity for an individualized bond hearing" violates his due process rights. Docket Item 1 at 6. As discussed above, the record in this case indicates that despite Clerveaux's prolonged detention, he has never been given any individualized review of the reasons for his detention. This Court therefore agrees with him that the respondents have violated his due process rights. *See Chi Thon Ngo*, 192 F.3d at 399 (government must "provide reasonable assurance of fair consideration of" an arriving alien's release on parole from detention.). In this Court's view, such an individualized

---

[17] In a footnote, Judge Hellerstein notes that "[b]efore *Zadvydas*, the Second Circuit applied *Mezei* to an excludable entrant among the Cuban 'Mariel' boat people." *Kouadio v. Decker*, 352 F. Supp. 3d 235, 240 n.2 (S.D.N.Y. 2018) (citing *Guzman v. Tippy*, 130 F.3d 64 (2d Cir. 1997)). But the decision does not elaborate further on *Guzman*'s implications for that case. And, as discussed above, this Court fails to see how *Zadvydas* undermines the case law's distinction between "arriving" aliens and those aliens who have "entered" the United States—legally or illegally.

review becomes necessary at some point to ensure that "both removable and inadmissible aliens are . . . free from detention that is arbitrary or capricious." *Zadvydas*, 533 U.S. at 721 (Kennedy, J., dissenting).

And contrary to the government's suggestion, the fact that Clerveaux can apply for discretionary parole does not solve the problem. *See supra* at 19-20. Due process is not satisfied merely by a statute that provides DHS officials with the discretion to parole a detainee. After prolonged detention, DHS must decide whether to release an alien one way or the other. That did not happen here.

Clerveaux has been subjected to prolonged detention, and he "has not yet received the rigorous review of his eligibility for" release from detention "that due process requires." *Chi Thon Ngo*, 192 F.3d at 399. Accordingly, his "petition for a writ of habeas corpus [must] be granted." *Id.* But this still leaves the question of the remedy.

## III. REMEDY

Clerveaux is entitled to a "rigorous review of his eligibility for" release. *Chi Thon Ngo*, 192 F.3d at 399. In *Guzman*, the Second Circuit found that the Cuban Review Plan, promulgated at 8 C.F.R. § 212.12, satisfies this standard. *See* 130 F.3d at 66. Likewise, in *Chi Thon Ngo*, the Third Circuit described interim rules that it found were enough. *See* 192 F.3d at 399. Those procedures certainly are examples of what satisfies due process in this area.

The government suggests that Clerveaux's parole application would be governed by 8 C.F.R. § 212.5.  Docket Items 16 at 2, 16-1 at 2.[18]  That regulation is considerably less favorable to Clerveaux than the process available at 8 C.F.R. § 212.12 (which is promulgated under § 1182(d)(5) authority[19]), or that the court approved in *Chi Thon Ngo.*

"Accordingly, since a construction of Section 212(d)(5), 8 U.S.C.A. § 1182(d)(5)," that requires the government to provide aliens subject to unreasonably prolonged § 1225(b) detention with custody reviews utilizing procedures at least as favorable to aliens as those examined in *Chi Thon Ngo* or *Guzman* "will remove serious doubt regarding the validity of the statute, [this Court] so construe[s] the section and hold[s]" that Clerveaux is entitled to such a rigorous custody review.  *See United States ex rel. Paktorovics v. Murff*, 260 F.2d 610, 615 (2d Cir. 1958); *see also Yamataya v. Fisher*, 189 U.S. 86, 101 (1903).  "[T]he discretion of the courts should not be substituted for the discretion to be exercised by the Attorney General as provided by law[, but] there must be [procedures] which will give assurance that the discretion of the Attorney General shall be exercised against a background of facts."  *Paktorovics*, 260 F.2d at 615.[20]

---

[18] The government notes that "DHS has detailed procedures for consideration of parole of arriving aliens found to have a credible fear of persecution or torture that are outlined in ICE Directive No. 11002.1."  Docket Item 16-1 at 2.  "[T]hese procedures include written notice to an arriving alien shortly after the credible fear determination is made, along with detailed procedures for seeking parole and specific factors considered by ICE in making a parole determination."  *Id.*

[19] *See* Mariel Cuban Parole Determinations, 52 Fed. Reg. 48,799, 48,801 (Dec. 28, 1987)

[20] It is true that 8 U.S.C. § 1182(d)(5) authorizes release from detention in only limited circumstances.  But one such circumstance is "urgent humanitarian reasons," and there can be little doubt that relieving a human being who, for example, is neither a flight risk nor a danger from prolonged imprisonment without trial pending removal

**CONCLUSION**

For the reasons stated above, Clerveaux's petition, Docket Item 1, is conditionally GRANTED.  **Within thirty calendar days of the date of this decision and order**, the government must release Clerveaux from detention unless it begins a custody review process for Clerveaux under procedures at least as favorable to him as those in *Chi Thon Ngo v. I.N.S.*, 192 F.3d 390, 399 (3d Cir. 1999) or *Guzman v. Tippy*, 130 F.2d 64, 66 (2d Cir. 1997).  Within **twenty days of the date of this order**, the government shall provide this Court and opposing counsel with notice of the process that it has selected for Clerveaux's custody review as well as a proposed schedule for that review, which should be completed promptly.[21]

SO ORDERED.

Dated:      July 31, 2019
             Buffalo, New York

                        *s/ Lawrence J. Vilardo*
                        LAWRENCE J. VILARDO
                        UNITED STATES DISTRICT JUDGE

---

proceedings is a plausible "urgent humanitarian reason."  Indeed, in promulgating the Cuban Review Plan, the INS itself acknowledged that "long-term confinement" is a "humanitarian problem."  *See* Mariel Cuban Parole Determinations, 52 Fed. Reg. 48,799, 48,800 (Dec. 28, 1987) (original "Status Review Plan was intended to balance the need to protect the American public from potentially dangerous aliens with the humanitarian problems created by . . . prospects for long-term confinement that faced excludable but unreturnable Mariel Cubans.").

[21] Clerveaux requests that this court "[o]rder [r]espondents to refrain from transferring [him] out of the jurisdiction of this Court during the pendency of this proceeding and while [he] remans in [the r]espondents' custody."  Docket Item 1 at 10.  But "[i]t is well established that jurisdiction attaches on the initial filing for habeas corpus relief, and it is not destroyed by a transfer of the petitioner and the accompanying custodial change."  *Santillanes v. U.S. Parole Comm'n*, 754 F.2d 887, 888 (10th Cir. 1985).  In other words, regardless of where Clerveaux is housed, this Court retains jurisdiction over his habeas petition.  So there is no need to order the respondents to refrain from transferring him.